(Slip Opinion)                  OCTOBER TERM, 2011                              1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SACKETT ET VIR *v.* ENVIRONMENTAL PROTECTION AGENCY ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 10–1062.   Argued January 9, 2012—Decided March 21, 2012

The Clean Water Act prohibits "the discharge of any pollutant by any person," 33 U. S. C. §1311, without a permit, into "navigable waters," §1344.  Upon determining that a violation has occurred, the Environmental Protection Agency (EPA) may either issue a compliance order or initiate a civil enforcement action.  §1319(a)(3).  The resulting civil penalty may not "exceed [$37,500] per day for each violation."  §1319(d).  The Government contends that the amount doubles to $75,000 when the EPA prevails against a person who has been issued a compliance order but has failed to comply.

The Sacketts, petitioners here, received a compliance order from the EPA, which stated that their residential lot contained navigable waters and that their construction project violated the Act.   The Sacketts sought declarative and injunctive relief in the Federal District Court, contending that the compliance order was "arbitrary [and] capricious" under the Administrative Procedure Act (APA), 5 U. S. C. §706(2)(A), and that it deprived them of due process in violation of the Fifth Amendment.  The District Court dismissed the claims for want of subject-matter jurisdiction.  The Ninth Circuit affirmed, concluding that the Clean Water Act precluded pre-enforcement judicial review of compliance orders and that such preclusion did not violate due process.

*Held:* The Sacketts may bring a civil action under the APA to challenge the issuance of the EPA's order.  Pp. 4–10.

   (a) The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court."  5 U. S. C. §704.  The compliance order here has all the hallmarks of APA finality.  Through it, the EPA "determined" "rights or obligations," *Bennett* v.

*Spear*, 520 U. S. 154, 178, requiring the Sacketts to restore their property according to an agency-approved plan and to give the EPA access. Also, "legal consequences . . . flow" from the order, *ibid.*, which, according to the Government's litigating position, exposes the Sacketts to double penalties in future enforcement proceedings. The order also severely limits their ability to obtain a permit for their fill from the Army Corps of Engineers, see 33 U. S. C. §1344; 33 CFR §326.3(e)(1)(iv). Further, the order's issuance marks the "consummation" of the agency's decisionmaking process, *Bennett*, *supra,* at 178, for the EPA's findings in the compliance order were not subject to further agency review. The Sacketts also had "no other adequate remedy in a court," 5 U. S. C. §704. A civil action brought by the EPA under 33 U. S. C. §1319 ordinarily provides judicial review in such cases, but the Sacketts cannot initiate that process. And each day they wait, they accrue additional potential liability. Applying to the Corps of Engineers for a permit and then filing suit under the APA if that permit is denied also does not provide an adequate remedy for the EPA's action. Pp. 4–6.

  (b) The Clean Water Act is not a statute that "preclude[s] judicial review" under the APA, 5 U. S. C. §701(a)(1). The APA creates a "presumption favoring judicial review of administrative action." *Block* v. *Community Nutrition Institute*, 467 U. S. 340, 349. While this presumption "may be overcome by inferences of intent drawn from the statutory scheme as a whole," *ibid.,* the Government's arguments do not support an inference that the Clean Water Act's statutory scheme precludes APA review. Pp. 7–10.

622 F. 3d 1139, reversed and remanded.

  SCALIA, J., delivered the opinion for a unanimous Court. GINSBURG, J., and ALITO, J., filed concurring opinions.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 10–1062

CHANTELL SACKETT, ET VIR, PETITIONERS *v.* ENVI-
RONMENTAL PROTECTION AGENCY, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[March 21, 2012]

JUSTICE SCALIA delivered the opinion of the Court.

We consider whether Michael and Chantell Sackett may
bring a civil action under the Administrative Procedure
Act, 5 U. S. C. §500 *et seq.*, to challenge the issuance by
the Environmental Protection Agency (EPA) of an admin-
istrative compliance order under §309 of the Clean Water
Act, 33 U. S. C. §1319. The order asserts that the Sack-
etts' property is subject to the Act, and that they have
violated its provisions by placing fill material on the prop-
erty; and on this basis it directs them immediately to
restore the property pursuant to an EPA work plan.

I

The Clean Water Act prohibits, among other things, "the
discharge of any pollutant by any person," §1311, without
a permit, into the "navigable waters," §1344—which the
Act defines as "the waters of the United States," §1362(7).
If the EPA determines that any person is in violation of
this restriction, the Act directs the agency either to issue
a compliance order or to initiate a civil enforcement action.
§1319(a)(3). When the EPA prevails in a civil action, the
Act provides for "a civil penalty not to exceed [$37,500] per

day for each violation."[1]  §1319(d).  And according to the Government, when the EPA prevails against any person who has been issued a compliance order but has failed to comply, that amount is increased to $75,000—up to $37,500 for the statutory violation and up to an additional $37,500 for violating the compliance order.

The particulars of this case flow from a dispute about the scope of "the navigable waters" subject to this enforcement regime.  Today we consider only whether the dispute may be brought to court by challenging the compliance order—we do not resolve the dispute on the merits. The reader will be curious, however, to know what all the fuss is about.  In *United States* v. *Riverside Bayview Homes, Inc.*, 474 U. S. 121 (1985), we upheld a regulation that construed "the navigable waters" to include "freshwater wetlands," *id.,* at 124, themselves not actually navigable, that were adjacent to navigable-in-fact waters.  Later, in *Solid Waste Agency of Northern Cook Cty.* v. *Army Corps of Engineers*, 531 U. S. 159 (2001), we held that an abandoned sand and gravel pit, which "seasonally ponded" but which was not adjacent to open water, *id.,* at 164, was not part of the navigable waters.  Then most recently, in *Rapanos* v. *United States*, 547 U. S. 715 (2006), we considered whether a wetland not adjacent to navigable-in-fact waters fell within the scope of the Act.  Our answer was no, but no one rationale commanded a majority of the Court.  In his separate opinion, THE CHIEF JUSTICE expressed the concern that interested parties would lack

——————

[1] The original statute set a penalty cap of $25,000 per violation per day.  The Federal Civil Penalties Inflation Adjustment Act of 1990, 104 Stat. 890, note following 28 U. S. C. §2461, as amended by the Debt Collection Improvement Act of 1996, §3720E, 110 Stat. 1321–373, note following 28 U. S. C. §2461, p. 1315 (Amendment), authorizes the EPA to adjust that maximum penalty for inflation.  On the basis of that authority, the agency has raised the cap to $37,500.  See 74 Fed. Reg. 626, 627 (2009).

guidance "on precisely how to read Congress' limits on the reach of the Clean Water Act" and would be left "to feel their way on a case-by-case basis." *Id.,* at 758 (concurring opinion).

The Sacketts are interested parties feeling their way. They own a ⅔-acre residential lot in Bonner County, Idaho. Their property lies just north of Priest Lake, but is separated from the lake by several lots containing permanent structures. In preparation for constructing a house, the Sacketts filled in part of their lot with dirt and rock. Some months later, they received from the EPA a compliance order. The order contained a number of "Findings and Conclusions," including the following:

> "1.4 [The Sacketts' property] contains wetlands within the meaning of 33 C. F. R. §328.4(8)(b); the wetlands meet the criteria for jurisdictional wetlands in the 1987 'Federal Manual for Identifying and Delineating Jurisdictional Wetlands.'
>
> "1.5 The Site's wetlands are adjacent to Priest Lake within the meaning of 33 C. F. R. §328.4(8)(c). Priest Lake is a 'navigable water' within the meaning of section 502(7) of the Act, 33 U. S. C. §1362(7), and 'waters of the United States' within the meaning of 40 C. F. R. §232.2.
>
> "1.6 In April and May, 2007, at times more fully known to [the Sacketts, they] and/or persons acting on their behalf discharged fill material into wetlands at the Site. [They] filled approximately one half acre.
>
> .          .          .          .          .
>
> "1.9 By causing such fill material to enter waters of the United States, [the Sacketts] have engaged, and are continuing to engage, in the 'discharge of pollutants' from a point source within the meaning of sections 301 and 502(12) of the Act, 33 U. S. C. §§1311 and 1362(12).
>
> .          .          .          .          .

> "1.11 [The Sacketts'] discharge of pollutants into waters of the United States at the Site without [a] permit constitutes a violation of section 301 of the Act, 33 U. S. C. §1311." App. 19–20.

On the basis of these findings and conclusions, the order directs the Sacketts, among other things, "immediately [to] undertake activities to restore the Site in accordance with [an EPA-created] Restoration Work Plan" and to "provide and/or obtain access to the Site . . . [and] access to all records and documentation related to the conditions at the Site . . . to EPA employees and/or their designated representatives." *Id.*, at 21–22, ¶¶2.1, 2.7.

The Sacketts, who do not believe that their property is subject to the Act, asked the EPA for a hearing, but that request was denied. They then brought this action in the United States District Court for the District of Idaho, seeking declaratory and injunctive relief. Their complaint contended that the EPA's issuance of the compliance order was "arbitrary [and] capricious" under the Administrative Procedure Act (APA), 5 U. S. C. §706(2)(A), and that it deprived them of "life, liberty, or property, without due process of law," in violation of the Fifth Amendment. The District Court dismissed the claims for want of subject-matter jurisdiction, and the United States Court of Appeals for the Ninth Circuit affirmed, 622 F. 3d 1139 (2010). It concluded that the Act "preclude[s] pre-enforcement judicial review of compliance orders," *id.,* at 1144, and that such preclusion does not violate the Fifth Amendment's due process guarantee, *id.,* at 1147. We granted certiorari. 564 U. S. ___ (2011).

## II

The Sacketts brought suit under Chapter 7 of the APA, which provides for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U. S. C. §704. We consider first whether the compliance

order is final agency action. There is no doubt it is agency action, which the APA defines as including even a "failure to act." §§551(13), 701(b)(2). But is it *final?* It has all of the hallmarks of APA finality that our opinions establish. Through the order, the EPA "'determined'" "'rights or obligations.'" *Bennett* v. *Spear*, 520 U. S. 154, 178 (1997) (quoting *Port of Boston Marine Terminal Assn.* v. *Rederiaktiebolaget Transatlantic*, 400 U. S. 62, 71 (1970)). By reason of the order, the Sacketts have the legal obligation to "restore" their property according to an agency-approved Restoration Work Plan, and must give the EPA access to their property and to "records and documentation related to the conditions at the Site." App. 22, ¶2.7. Also, "'legal consequences . . . flow'" from issuance of the order. *Bennett*, *supra,* at 178 (quoting *Marine Terminal*, *supra,* at 71). For one, according to the Government's current litigating position, the order exposes the Sacketts to double penalties in a future enforcement proceeding.[2] It also severely limits the Sacketts' ability to obtain a permit for their fill from the Army Corps of Engineers, see 33 U. S. C. §1344. The Corps' regulations provide that, once the EPA has issued a compliance order with respect to certain property, the Corps will not process a permit application for that property unless doing so "is clearly appropriate." 33 CFR §326.3(e)(1)(iv) (2011).[3]

The issuance of the compliance order also marks the "'consummation'" of the agency's decisionmaking process.

─────────

[2]We do not decide today that the Government's position is correct, but assume the consequences of the order to be what the Government asserts.

[3]The regulation provides this consequence for "enforcement litigation that has been initiated by other Federal . . . regulatory agencies." 33 CFR §326.3(e)(1)(iv) (2011). The Government acknowledges, however, that EPA's issuance of a compliance order is considered by the Corps to fall within the provision. Brief for Respondents 31. Here again, we take the Government at its word without affirming that it represents a proper interpretation of the regulation.

*Bennett*, *supra,* at 178 (quoting *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.*, 333 U. S. 103, 113 (1948)).  As the Sacketts learned when they unsuccessfully sought a hearing, the "Findings and Conclusions" that the compliance order contained were not subject to further agency review.  The Government resists this conclusion, pointing to a portion of the order that invited the Sacketts to "engage in informal discussion of the terms and requirements" of the order with the EPA and to inform the agency of "any allegations [t]herein which [they] believe[d] to be inaccurate."  App. 22–23, ¶2.11.  But that confers no entitlement to further agency review.  The mere possibility that an agency might reconsider in light of "informal discussion" and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal.

The APA's judicial review provision also requires that the person seeking APA review of final agency action have "no other adequate remedy in a court," 5 U. S. C. §704.  In Clean Water Act enforcement cases, judicial review ordinarily comes by way of a civil action brought by the EPA under 33 U. S. C. §1319.  But the Sacketts cannot initiate that process, and each day they wait for the agency to drop the hammer, they accrue, by the Government's telling, an additional $75,000 in potential liability.  The other possible route to judicial review—applying to the Corps of Engineers for a permit and then filing suit under the APA if a permit is denied—will not serve either.  The remedy for denial of action that might be sought from one agency does not ordinarily provide an "adequate remedy" for action already taken by another agency.  The Government, to its credit, does not seriously contend that other available remedies alone foreclose review under §704.  Instead, the Government relies on §701(a)(1) of the APA, which excludes APA review "to the extent that [other] statutes preclude judicial review."  The Clean Water Act, it says, is such a statute.

### III

Nothing in the Clean Water Act *expressly* precludes judicial review under the APA or otherwise. But in determining "[w]hether and to what extent a particular statute precludes judicial review," we do not look "only [to] its express language." *Block* v. *Community Nutrition Institute*, 467 U. S. 340, 345 (1984). The APA, we have said, creates a "presumption favoring judicial review of administrative action," but as with most presumptions, this one "may be overcome by inferences of intent drawn from the statutory scheme as a whole." *Id.,* at 349. The Government offers several reasons why the statutory scheme of the Clean Water Act precludes review.

The Government first points to 33 U. S. C. §1319(a)(3), which provides that, when the EPA "finds that any person is in violation" of certain portions of the Act, the agency "shall issue an order requiring such person to comply with [the Act], or . . . shall bring a civil action [to enforce the Act]." The Government argues that, because Congress gave the EPA the choice between a judicial proceeding and an administrative action, it would undermine the Act to allow judicial review of the latter. But that argument rests on the question-begging premise that the relevant difference between a compliance order and an enforcement proceeding is that only the latter is subject to judicial review. There are eminently sound reasons other than insulation from judicial review why compliance orders are useful. The Government itself suggests that they "provid[e] a means of notifying recipients of potential violations and quickly resolving the issues through voluntary compliance." Brief for Respondents 39. It is entirely consistent with this function to allow judicial review when the recipient does not choose "voluntary compliance." The Act does not guarantee the EPA that issuing a compliance order will always be the most effective choice.

The Government also notes that compliance orders are

not self-executing, but must be enforced by the agency in a plenary judicial action. It suggests that Congress therefore viewed a compliance order "as a step in the deliberative process[,] . . . rather than as a coercive sanction that itself must be subject to judicial review." *Id.,* at 38. But the APA provides for judicial review of all final agency actions, not just those that impose a self-executing sanction. And it is hard for the Government to defend its claim that the issuance of the compliance order was just "a step in the deliberative process" when the agency rejected the Sacketts' attempt to obtain a hearing and when the *next* step will either be taken by the Sacketts (if they comply with the order) or will involve judicial, not administrative, deliberation (if the EPA brings an enforcement action). As the text (and indeed the very name) of the compliance order makes clear, the EPA's "deliberation" over whether the Sacketts are in violation of the Act is at an end; the agency may still have to deliberate over whether it is confident enough about this conclusion to initiate litigation, but that is a separate subject.

The Government further urges us to consider that Congress expressly provided for prompt judicial review, on the administrative record, when the EPA assesses administrative penalties after a hearing, see §1319(g)(8), but did not expressly provide for review of compliance orders. But if the express provision of judicial review in one section of a long and complicated statute were alone enough to overcome the APA's presumption of reviewability for all final agency action, it would not be much of a presumption at all.

The cases on which the Government relies simply are not analogous. In *Block* v. *Community Nutrition Institute*, *supra*, we held that the Agricultural Marketing Agreement Act of 1937, which expressly allowed milk handlers to obtain judicial review of milk market orders, precluded review of milk market orders in suits brought by milk

*consumers.* 467 U. S., at 345–348. Where a statute provides that particular agency action is reviewable at the instance of one party, who must first exhaust administrative remedies, the inference that it is not reviewable at the instance of other parties, who are not *subject* to the administrative process, is strong. In *United States* v. *Erika, Inc.*, 456 U. S. 201 (1982), we held that the Medicare statute, which expressly provided for judicial review of awards under Part A, precluded review of awards under Part B. *Id.,* at 206–208. The strong parallel between the award provisions in Part A and Part B of the Medicare statute does not exist between the issuance of a compliance order and the assessment of administrative penalties under the Clean Water Act. And in *United States* v. *Fausto*, 484 U. S. 439 (1988), we held that the Civil Service Reform Act, which expressly excluded certain "nonpreference" employees from the statute's review scheme, precluded review at the instance of those employees in a separate Claims Court action. *Id.,* at 448–449. Here, there is no suggestion that Congress has sought to exclude compliance-order recipients from the Act's review scheme; quite to the contrary, the Government's case is premised on the notion that the Act's primary review mechanisms are open to the Sacketts.

Finally, the Government notes that Congress passed the Clean Water Act in large part to respond to the inefficiency of then-existing remedies for water pollution. Compliance orders, as noted above, can obtain quick remediation through voluntary compliance. The Government warns that the EPA is less likely to use the orders if they are subject to judicial review. That may be true—but it will be true for all agency actions subjected to judicial review. The APA's presumption of judicial review is a repudiation of the principle that efficiency of regulation conquers all. And there is no reason to think that the Clean Water Act was uniquely designed to enable the strong-arming of

regulated parties into "voluntary compliance" without the opportunity for judicial review—even judicial review of the question whether the regulated party is within the EPA's jurisdiction.  Compliance orders will remain an effective means of securing prompt voluntary compliance in those many cases where there is no substantial basis to question their validity.

*        *        *

We conclude that the compliance order in this case is final agency action for which there is no adequate remedy other than APA review, and that the Clean Water Act does not preclude that review.  We therefore reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–1062

_____

## CHANTELL SACKETT, ET VIR, PETITIONERS *v.* ENVIRONMENTAL PROTECTION AGENCY, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[March 21, 2012]

JUSTICE GINSBURG, concurring.

Faced with an EPA administrative compliance order threatening tens of thousands of dollars in civil penalties per day, the Sacketts sued "to contest the jurisdictional bases for the order." Brief for Petitioners 9. "As a logical prerequisite to the issuance of the challenged compliance order," the Sacketts contend, "EPA had to determine that it has regulatory authority over [our] property." *Id.*, at 54–55. The Court holds that the Sacketts may immediately litigate their jurisdictional challenge in federal court. I agree, for the Agency has ruled definitively on that question. Whether the Sacketts could challenge not only the EPA's authority to regulate their land under the Clean Water Act, but also, at this pre-enforcement stage, the terms and conditions of the compliance order, is a question today's opinion does not reach out to resolve. Not raised by the Sacketts here, the question remains open for another day and case. On that understanding, I join the Court's opinion.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–1062

_____

CHANTELL SACKETT, ET VIR, PETITIONERS *v.* ENVIRONMENTAL PROTECTION AGENCY, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[March 21, 2012]

JUSTICE ALITO, concurring.

The position taken in this case by the Federal Government—a position that the Court now squarely rejects—would have put the property rights of ordinary Americans entirely at the mercy of Environmental Protection Agency (EPA) employees.

The reach of the Clean Water Act is notoriously unclear. Any piece of land that is wet at least part of the year is in danger of being classified by EPA employees as wetlands covered by the Act, and according to the Federal Government, if property owners begin to construct a home on a lot that the agency thinks possesses the requisite wetness, the property owners are at the agency's mercy. The EPA may issue a compliance order demanding that the owners cease construction, engage in expensive remedial measures, and abandon any use of the property. If the owners do not do the EPA's bidding, they may be fined up to $75,000 per day ($37,500 for violating the Act and another $37,500 for violating the compliance order). And if the owners want their day in court to show that their lot does not include covered wetlands, well, as a practical matter, that is just too bad. Until the EPA sues them, they are blocked from access to the courts, and the EPA may wait as long as it wants before deciding to sue. By that time, the potential fines may easily have reached the

millions. In a nation that values due process, not to mention private property, such treatment is unthinkable.

The Court's decision provides a modest measure of relief. At least, property owners like petitioners will have the right to challenge the EPA's jurisdictional determination under the Administrative Procedure Act. But the combination of the uncertain reach of the Clean Water Act and the draconian penalties imposed for the sort of violations alleged in this case still leaves most property owners with little practical alternative but to dance to the EPA's tune.

Real relief requires Congress to do what it should have done in the first place: provide a reasonably clear rule regarding the reach of the Clean Water Act. When Congress passed the Clean Water Act in 1972, it provided that the Act covers "the waters of the United States." 33 U. S. C. §1362(7). But Congress did not define what it meant by "the waters of the United States"; the phrase was not a term of art with a known meaning; and the words themselves are hopelessly indeterminate. Unsurprisingly, the EPA and the Army Corps of Engineers interpreted the phrase as an essentially limitless grant of authority. We rejected that boundless view, see *Rapanos* v. *United States*, 547 U. S. 715, 732–739 (2006) (plurality opinion); *Solid Waste Agency of Northern Cook Cty.* v. *Army Corps of Engineers*, 531 U. S. 159, 167–174 (2001), but the precise reach of the Act remains unclear. For 40 years, Congress has done nothing to resolve this critical ambiguity, and the EPA has not seen fit to promulgate a rule providing a clear and sufficiently limited definition of the phrase. Instead, the agency has relied on informal guidance. But far from providing clarity and predictability, the agency's latest informal guidance advises property owners that many jurisdictional determinations concerning wetlands can only be made on a case-by-case basis by EPA field staff. See Brief for Competitive Enterprise

ALITO, J., concurring

Institute as *Amicus Curiae* 7–13.

Allowing aggrieved property owners to sue under the Administrative Procedure Act is better than nothing, but only clarification of the reach of the Clean Water Act can rectify the underlying problem.