IKUTA, Circuit Judge,
dissenting:
Congress mandated that the National Park Service (Park Service) follow a process for identifying which tribes are entitled to receive the human remains and *1096 archeological artifacts removed from the Canyon de Chelly. That process, codified in the Native American Graves Protection and Repatriation Act (NAGPRA), provides for repatriation of human remains and associated artifacts to their known descendants. See 25 U.S.C. §§ 3001-3013. The Park Service is slowly implementing the NAGPRA process with respect to the human remains and artifacts in its possession. Its snaillike progress is in part attributable to the ongoing resistance of the Navajo Nation, which objects to Congress’s process, and has filed suit against the Park Service for an immediate declaration that it owns all the human remains and artifacts that were removed from the Canyon. Although the Navajo Nation may be frustrated, a federal court cannot hear such an action unless the United States has waived its sovereign immunity under § 704 of the Administrative Procedure Act (APA),[1] which makes reviewable a “final agency action for which there is no other adequate remedy in a court.” 5 U.S.C. § 704; Maj. op. at 1188-89.
Despite the fact that the Park Service has not even come close to taking a final agency action, today the majority decides to take matters into its own hands. It selects virtually at random one of the many steps in the Park Service’s ongoing effort and claims it constitutes a final agency action, Maj. op. at 1190. Because this decision is contrary to both the APA and our precedents, I dissent.
I
The Park Service’s slow-motion implementation of the NAGPRA process mirrors the long history of the Canyon de Chelly. The Canyon has been inhabited by humans for nearly 4,500 years and has been home to permanent settlements for about 2,000 years. Starting around 750 A.D. the Canyon became home to the ancient Pueblo, sometimes referred to as the Anasazi. The ancient Pueblo remained in the Canyon until about 1300, when they left to seek better farmlands. Their descendants, the Hopi Indians, continued to live in the Canyon until about 1600. The modem Zuni and Hopi Indians are the descendants of the ancient Pueblo. The Navajos are relative newcomers, arriving at the Canyon around 1700.
The federal government’s involvement in the collection and preservation of human remains and artifacts from the Canyon de Chelly dates back to 1906, when the Antiquities Act, 54 U.S.C. § 320302 (1906), authorized federal agencies to issue permits for the excavation and collection of archaeological artifacts so long as they were preserved in public museums. Under the authority of this act, the Park Service removed and preserved some 297 sets of human remains from the Canyon de Chelly. In 1979, the Archaeological Resources Protection Act (ARPA), 16 U.S.C. §§ 470aa-470mm (1979), added new permit requirements, and the Park Service removed an additional six sets of remains pursuant to a federal permit. In all, the Park Service removed 303 sets of remains from the Canyon before NAGPRA was enacted in 1990. The Park Service preserved all 303 sets of remains at the Western Archaeology Conservation Center in Tucson, Arizona.
It was not until 1990 that Congress enacted NAGPRA, which “provides a framework for establishing ownership and control of (1) newly discovered Native American remains and funerary objects (collectively ‘cultural items’) and (2) cultural items already held by certain feder *1097 ally funded museums and educational institutions.” White v. Univ. of Cal., 765 F.3d 1010, 1016 (9th Cir.2014) (citing 25 U.S.C. §§ 3001-3013); see also 43 C.F.R. § 10.1. With respect to pre-existing collections of human remains and artifacts, NAGPRA requires federal agencies and museums with “possession or control over [such] holdings or collections” to “compile an inventory” of the items and “identify the geographical and cultural affiliation of such item[s]” where possible. 25 U.S.C. § 3003(a). Once the federal agency or museum has identified the cultural affiliation of the object, it must notify the affected tribes and publish a public notice in the Federal Register. Id. § 3003(d).
After the cultural affiliation process is complete, Native American human remains and associated artifacts must be expeditiously repatriated to “a known lineal descendant of the Native American” or of the affected tribe, upon request of that descendant or tribe. Id. § 3005(a)(1). Other cultural artifacts may be returned to individuals or tribes that “owned or controlled” the items. Id. § 3005(a)(5). An agency may retain artifacts only if it has the “right of possession,” meaning that the items were “obtained with full knowledge and consent of the next of kin or the official governing body” of the relevant tribe. Id. §§ 3001(13), 3005(c).
The regulations provide a robust dispute resolution process to address disagreements about the implementation of NAG-PRA or the disposition of cultural artifacts. A federal agency’s “final denial of a request ... for the repatriation or disposition of human remains [and cultural objects] brought under, and in compliance with [NAGPRA] constitutes a final agency action under the Administrative Procedure Act (5 U.S.C. 704).” 43 C.F.R. § 10.1(b)(3). When there are multiple requests for repatriation, and the competing claimants cannot resolve their dispute through informal negotiations, they may bring an action in district court. Id. §§ 10.10(c)(2), 10.11(e), 10.17. Further, a party claiming legal property rights to the human remains or artifacts that supersede NAGPRA can vindicate those claims in court. Id. § 10.11(e)(3).
As mandated by NAGPRA, the Park Service started the inventory process for all 303 sets of remains in the mid-1990s. Pursuant to § 3003(a), the Park Service began consulting with the Navajo Nation, Hopi, and Zuni regarding the cultural affiliation of the remains. 25 U.S.C. § 3003(b)(1)(A). By 1996 the Park Service had compiled a draft inventory, which it shared with the participating tribes. The draft inventory identified some of the remains as belonging to ancestral Puebloans. Under NAGPRA, such a finding would generally require the Park Service to return the remains to the Hopi and Zuni Tribes, the known lineal descendants of the Puebloans, upon their request. Id. § 3005(a).
After the Park Service circulated the draft inventory, the Navajo Nation objected to the NAGPRA process and claimed that all “human remains and funerary objects” found in the Canyon de Chelly are “property of the Navajo Nation” by virtue of the Navajo’s land ownership. The Park Service stated it would respond to “any requests for repatriation in strict accordance with the NAGPRA.” This response did not satisfy the Navajo Nation. Faced with the Navajo Nation’s resistance, the Park Service put the inventory process on hold.
In 2010, the Park Service asked lawyers at the Division of Parks and Wildlife and Division of Indian Affairs for advice. The Park Service’s lawyers informally confirmed that for purposes of NAGPRA, the Park Service had possession and control of *1098 the items that had been removed from the Canyon de Chelly and that these archeological resources were not exempt from NAGPRA’s repatriation procedures. Therefore, according to the lawyers, the Park Service was bound to comply with the procedure set forth in the statute and regulations. This advice was provided informally; the Park Service later explained that it takes at least three years to obtain an official legal opinion. In June 2011, the Park Service informed the Navajo Nation about the informal advice of its lawyers and its intention to move forward with the NAGPRA process.
Two months later, the Navajo Nation sent a formal demand letter to the Park Service and threatened to sue unless the Park Service turned over all human remains and artifacts to the Navajo Nation immediately. In its response on September 7, 2011, the Park Service stated that its position remained that it was required by law to complete the NAGPRA process. It hoped that the Navajo Nation would develop an agreement with the Hopi and Zuni Pueblo tribes so that they “would have more consistent input into the [Park Service’s] final decision” regarding repatriation of the remains. The letter also stated the Park Service’s hope that the Navajo Nation would not engage in litigation, which would cause further delays. The Park Service concluded by stating that it continued “to believe that we can work through our differences in a cooperative and collaborative manner.” The Navajo Nation then initiated this lawsuit.
II
A review of the applicable law makes clear that no event in the Park Service’s implementation of NAGPRA to date constituted a final agency action.
To be final for purposes of § 704, an agency action must satisfy two requirements. First, the agency action “must mark the ‘consummation’ of the agency’s decisionmaking process ... it must not be of a merely tentative or interlocutory nature.” Bennett v. Spear, 520 U.S. 154, 177-78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal citation omitted). Second, “the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.” Id. at 178, 117 S.Ct. 1154 (internal quotations omitted). The elements of both Bennett prongs have been clearly delineated.
For an action to “mark the consummation of the agency’s decisionmaking process” under the first Bennett prong, there must be an established “formal procedure,” Fairbanks N. Star Borough v. U.S. Army Corps of Eng’rs, 543 F.3d 586, 592-93 (9th Cir.2008), in which the agency “evaluated] the merits of [the issue] to arrive at a reasoned, deliberate decision,” see ONRC Action v. Bureau of Land Management, 150 F.3d 1132, 1136 (9th Cir. 1998). A final decision must establish an official position that is “considered, definite and firm,” Fairbanks, 543 F.3d at 593, and constitutes the agency’s “last word on the matter,” Or. Nat. Desert Ass’n v. U.S. Forest Serv., 465 F.3d 977, 984 (9th Cir. 2006). A federal agency’s informal recommendation or assessment is not a final agency action. See City of San Diego v. Whitman, 242 F.3d 1097, 1101-02 (9th Cir. 2001); Aminoil U.S.A., Inc. v. Cal. State Water Res. Control Bd., 674 F.2d 1227, 1231 (9th Cir.1982). Nor is an agency’s notice of its plans to make a decision in the future. See Gen. Atomics v. U.S. Nuclear Regulatory Comm’n, 75 F.3d 536, 540 (9th Cir.1996); Ukiah Valley Med. Ctr. v. FTC, 911 F.2d 261, 263-64 (9th Cir.1990). As a practical matter, this means that final agency decisions are virtually always written and generally published. See, e.g., Sackett v. EPA, — U.S.—, 132 S.Ct. *1099 1367, 1370-72, 182 L.Ed.2d 367 (2012) (formal, written EPA compliance order); Or. Nat. Desert Ass’n, 466 F.3d at 979-80 (written annual operating instructions, which functioned as a grazing permit, issued to Forest Service permit holders); Bennett, 520 U.S. at 177-78, 117 S.Ct. 1154 (written Biological Opinion provided by the Fish and Wildlife Service).
To satisfy the second Bennett prong, an agency’s decision must have the force and effect of law and be binding on the plaintiff. The decision must require the plaintiff to do or forbear from some action, see Fairbanks, 543 F.3d at 593, such that the plaintiffs only choice is whether to comply with or defy a legal requirement, see FTC v. Standard Oil Co. of Cal., 449 U.S. 232, 239-40, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980). An expression of the agency’s view regarding what the law requires is not enough, Fairbanks, 543 F.3d at 594, nor is a decision that a statute applies to an activity or individual, see Hale v. Norton, 476 F.3d 694, 697 (9th Cir.2007) (holding that a Park Service decision that landowners were subject to permit requirements was not a final agency action under Bennett ); Hecla Mining Co. v. EPA, 12 F.3d 164, 165-66 (9th Cir.1993) (holding that the decision to include a river and mine on the lists subjecting them to permit requirements “is not the final agency action necessary to state a cause of action under § 704 of the APA”).
Further, the agency’s decision must have legal and not merely practical consequences. It is well established that agency actions subjecting the plaintiff to a “greater risk of increased fines,” an “onerous administrative maze,” or further agency proceedings are not final, as these are practical effects, not legal consequences. Fairbanks, 543 F.3d at 595-96. Even an agency decision that causes immediate financial impacts or triggers profound economic consequences is not final under the second Bennett prong, as these too are merely practical effects. See id. Rather, an agency’s decision is final if it has tangible legal consequences or otherwise alters the legal relationship between the parties. Id. at 594.
Ill
The Park Service’s continuation of the NAGPRA inventory process meets neither of the Bennett prongs and so is not a final agency action.
First, there has been no “consummation” of any decisionmaking process. The majority asserts that “the [Park Service’s] decision to apply NAGPRA to these remains and objects ... constituted a final agency action.” Maj. op. at 1092. But the Park Service decided that NAGPRA was applicable to its 303 sets of remains two decades ago, when it commenced the NAGPRA process. The Park Service’s long-ago decision to comply with NAGPRA did not mark the “consummation” of any decisionmaking process, but rather its beginning. See Hale, 476 F.3d at 697; Hecla Mining Co., 12 F.3d at 165-66 (holding that an agency’s decision to initiate regulatory proceedings does not constitute a final agency action because it is “merely preliminary”).
Nor did the Park Service’s 2010 request to its lawyers for confirmation that NAG-PRA applied constitute a final determination of the Park Service’s jurisdiction. The informal request occurred some 15 years after the Park Service began applying NAGPRA, and merely represented the continuation of the NAGPRA process. See ONRC Action, 150 F.3d at 1136. Indeed, if an agency is deemed to take a “final agency action” every time it asks its lawyers whether it is following the law, agencies will either be subject to challenge regarding every internal, interlocutory de- *1100 cisión—or will have to banish government lawyers from every government building. The Supreme Court rejected such a result in Bennett, holding that it was “loathe” to permit review of every procedural step taken by an agency, especially those “that had not yet resulted in a final disposition of the matter at issue.” 520 U.S. at 174, 117 S.Ct. 1154. Likewise, the Park Service’s September 2011 letter to the Navajo Nation merely reiterated that “[t]he position of the [Park Service] and the advice of our solicitors ... remains that we are required by law to complete the NAGPRA process.” (emphasis added). While the majority characterizes this letter as a “final response to the demands of the Navajo Nation,” Maj. op. at 1092, nothing in the letter suggests it is anything more than another response in the ongoing dialogue with the Navajo Nation.
In short, no case identified by the Navajo Nation or the majority comes close to suggesting that an agency’s decision to stay the course, bolstered by informal advice from counsel, constitutes the “consummation of the agency’s decisionmaking process.” [2] There is nothing in the record resembling the formal Biological Opinion at issue in Bennett, 520 U.S. at 177, 117 S.Ct. 1154, or the written grazing permit addressed in ONDA, 465 F.3d at 980. There is thus no support for the majority’s claim that the Park Service’s decision to continue with the NAGPRA process after obtaining its lawyers’ advice marked the consummation of the Park Service’s deci-sionmaking process regarding its jurisdiction. Maj. op. at 1091-92.
The second Bennett factor is also lacking here. The Park Service’s decision to proceed with the NAGPRA process does not impose any obligation on the Navajo Nation, and so is not “one by which rights or obligations have been determined or from which legal consequences will flow.” Bennett, 520 U.S. at 178, 117 S.Ct. 1154 (internal quotation marks and punctuation omitted). The Navajo Nation is not put to the choice of compliance or defiance with any requirement, see Standard Oil, 449 U.S. at 239-40, 101 S.Ct. 488; rather, it is free to decline to participate in the inventory process. See 25 U.S.C. § 3003(b); 43 C.F.R. § 10.9(b).[3] The Park Service’s decision to move forward may indeed have practical effects, in that it will delay vindication of the Navajo Nation’s alleged entitlement to the human remains and artifacts and will impose some costs if the Navajo Nation chooses to participate in the NAGPRA process. And while the Navajo Nation’s decision not to participate in the NAGPRA process may also have practical effects, see Maj. op. at 1094-95, a practical burden is not a legal burden, and any additional delay and expense are insufficient to make an agency decision final even if they turn out to be quite substantial. See Standard Oil, 449 U.S. at 242, 101 S.Ct. 488 (“Although [the burden of responding to agency enforcement] certainly is substantial, it is different in kind and legal effect from the burdens attending what heretofore has *1101 been considered to be final agency action”).
The majority claims that the Park Service’s decision to continue with the NAGR-PA inventory process “necessarily meant that some of the remains and objects might never be returned to the Navajo Nation,” Maj. op. at 1092, and “necessarily forecloses the Nation’s argument that it has complete ownership of the remains and objects pursuant to its treaty rights,” Maj. op. at 1093. The majority is simply mistaken. Once the NAGPRA process is complete, the Navajo Nation will be free to raise all the claims it brings today—including its challenges to the disposition of the human remains and artifacts, its claim that the Park Service breached an agreement to re-inter six sets of remains, see Maj. op. at 1093, and its argument that it has legal property rights in the items that supersede the NAGPRA process. See 43 C.F.R. §§ 10.10(c)(2); 10.11(e).[4]
The majority’s theory that the Park Service made a reviewable “threshold determination” of its property rights in the remains and artifacts before applying NAGPRA, Maj. op. at 1093-94, is completely backwards. Neither NAGPRA nor its implementing regulations require a federal agency to formally and finally determine whether it has “possession or control over” Native American artifacts before instituting the NAGPRA process. See 25 U.S.C. § 3003; 43 C.F.R. § 10.2. To the contrary, it is a federal agency’s decision that NAGPRA is not applicable which is deemed to be a final agency action subject to review. 43 C.F.R. § 10.1(b)(3). An agency’s decision that it has the requisite possession and control of human remains and artifacts to apply NAGPRA is not final or reviewable until after the inventory process is complete. See id. §§ 10.1(b)(3), 10.10(c). Nor can we infer that Congress intended an agency to make a formal determination of its legal rights to human remains and artifacts before applying NAGPRA. Congress knew how to require a determination of ownership rights when it wanted one, as NAGPRA expressly provides guidance for determining the “ownership or control” of Native American cultural items excavated after 1990, 25 U.S.C. § 3002(a), and establishes a process for determining whether agencies or museums have a “right of possession” to objects in their collections, id, § 3005(c). Both of these determinations are made at the end of the NAGPRA process, along with all the other repatriation decisions. Nothing in NAGPRA requires the threshold determination that the majority relies on, and Congress’s omission of such a provision indicates that it did not want any such threshold determination to occur.
The majority nonetheless claims that § 10,2 of the regulations requires the Park Service to ascertain whether it has a legal interest in the remains or artifacts before it starts the NAGPRA process. Maj. op. at 1093-94. By its terms, however, § 10.2 merely defines the term “museum,” and provides a safe harbor for museums that have borrowed cultural items from a third party.[5] The applicability of this regulation *1102 is therefore irrelevant for present purposes: only a museum’s decision that it did not have possession or control of the items in its collection would be subject to immediate legal review, id. § 10.1(b)(3), while a museum’s decision to apply NAGPRA would be reviewable only at the end of the process, see id. §§ 10.1(b)(3), 10.10(c).
Here, the relevant question is who is entitled to obtain the human remains and artifacts currently in the Park Service’s hands, and that is the very question which NAGPRA is designed to answer. The Navajo Nation’s claims to the human remains and artifacts are not superior on their face to the claims of the Hopi and Zuni Tribes, and federal law requires the Park Service to proceed through a step-by-step process for making these cultural affiliation and repatriation determinations. The Navajo Nation’s desire to short-circuit Congress’s plan is not sufficient to transform that ongoing process into a “final agency action.”
IV
In sum, the Park Service is making a good faith effort to comply with federal law, which requires it to engage in a deliberate and open process to determine who is entitled to the human remains and artifacts it currently holds. The majority’s strained attempt to detect a “final agency action” occurring at some point along the way, without a decisionmaking process, a written decision, or a determination that has any legal effect on the Navajo Nation, has no support in the record or in our precedent. Because there is no final agency action reviewable under § 704, the United States has not waived its sovereign immunity and we lack jurisdiction to hear this appeal. Accordingly, I dissent.

. Because the majority focuses on § 704 of the APA, I do not address whether the Navajo Nation could maintain its action under 5 U.S.C. § 702.

. The Navajo Nation argues that Bonnichsen v. United States is such a case. 367 F.3d 864 (9th Cir.2004). Its reliance is misplaced because that opinion did not address whether the decision to apply NAGPRA to remains that were possibly non-Indian was a final agency action. Rather, the issue of finality was decided by the district court and not appealed. See Bonnichsen v. U.S. Dept. of the Army, 969 F.Supp. 628, 637-38 (D.Ore.1997).

. While NAGPRA requires that the Park Service seek to consult with tribal governments during the cultural affiliation process, see Maj. op. at 1094-95; 25 U.S.C. § 3003(b)(1)(A); 43 C.F.R. § 10.9(b)(4), nothing in NAGPRA requires the Navajo Nation to cooperate.

. The majority mischaracterizes 43 C.F.R. § 10.11(e) by claiming that it “says nothing about when such an action may be brought.” Maj. op. at 1094 n. 12. By its own terms, § 10.11 applies to disputes "regarding the disposition of culturally unidentifiable human remains and associated funerary objects,” 43 C.F.R. § 10.11(e) (emphasis added), that arise after the NAGPRA inventory process is com-píete, id. § 10.11(a) ("This section ... applies to human remains previously determined to be Native American under § 10.9, but for which no lineal descendant or culturally affiliated Indian tribe or Native Hawaiian organization has been identified,”),

. Section 10.2 answers the question "Who must comply with these regulations?” as: "federal agency,” "federal agency official,” *1102 and "museum.” 43 C.F.R. § 10.2(a)(1)—(3). "Museum" is defined as "any institution or State or local government agency (including any institution of higher learning) that has possession of, or control over, human remains, funerary objects, sacred objects, or objects of cultural patrimony and receives Federal funds.” Id. § 10.2(a)(3) (emphasis added). In three subsections under the definition of museum, the regulations define each of the key terms in that definition: "possession,” id. § 10.2(a)(3)(i), "control," id. § 10.2(a)(3)(ii), and "receives Federal funds,” id. § 10.2(a)(3)(iii). The definition of "possession,” as used in the definition of "museum,” is "having physical custody of human remains, funerary objects, sacred objects, or objects of cultural patrimony with a sufficient legal interest to lawfully treat the objects as part of its collection for purposes of these regulations.” Id. § 10.2(a)(3)®. The regulation then explains that "[gjenerally, a museum or Federal agency would not be considered to have possession of human remains, funerary objects, sacred objects, or objects of cultural patrimony on loan from another individual, museum, or Federal agency.” Id. Because this language is included as part of the definition of “museum,” it provides a safe harbor for museums that do not want to engage in the expense of applying NAGPRA to items that are on loan from a third party, but would face penalties under § 10.2 if they failed to implement the NAGPRA process as required by statute.